**Commonwealth ex rel. Link v. Link**

*Lorry W. Post,* for petitioner.
*William E. Eimer,* for respondent.

MONROE, J., August 26, 1971.—An appeal having been taken by respondent in the within habeas corpus proceeding from an order of this court of June 2, 1971, refusing to amend or modify an order of the court entered March 23, 1970, wherein custody of the two minor children of the parties to this litigation was awarded to the mother, the within opinion is filed in compliance with Rule 46 of the Superior Court of Pennsylvania.

The action involves the custody of Theresa Marie Link and Andrew John Link, minor children of Kevin Link and Ronald Link, their natural parents. Kevin Link, the mother, is now 25 years of age and Ronald Link, the father, is now 28 years of age. The parties were married on April 18, 1964, the child Theresa was born April 20, 1965, and the son, Andrew John, was born July 4, 1967. At the time of the marriage, Ronald Link was in the military service, stationed on the west coast of the continental United States. He was discharged from military service in January 1966, and promptly became employed as a coordinator at the United Aircraft Corporation in Trevose, Bucks County, Pa. In March of 1969, the parents purchased a home at 54 Aspen Lane, Levittown, Pa., where the father, Ronald Link, still resides. On September 9, 1969, Kevin Link left the family domicile, taking with her her two children and moving to an apartment at Groveville, N. J., which she shared with a Mrs. Cremer and her children, without the consent of respondent and without giving him any knowledge of her whereabouts. After several weeks, respondent learned of petitioner's whereabouts, removed the children from the apartment and returned them to his home on Aspen Lane in Levittown.

This action was instituted by the mother's petition filed February 2, 1970, and hearing thereon was held

on March 23, 1970. An answer to the petition was not filed by respondent but his position at the hearing appeared to be that petitioner is unfit morally and emotionally to have her children and that the surroundings in which she was residing were not suitable for the general welfare of the children. The burden of respondent's attack upon petitioner was that unfitness was particularly evidenced by the fact that she had previously been married and had deserted two children born during the period of that marriage, one as the result of the marriage and the other resulting from extramarital relations. The burden of respondent's attack upon her moral fitness was his effort to establish that she had deserted the Link domicile because of improper and illicit relationships with a Mr. Frank Wollman. The evidence at the first hearing established the following facts.

The parties resided in a reasonable degree of happiness with each other until the summer of 1969. Both parents were fond of each other and fond of and devoted to their children. The father, however, at times did not control his temper and five or six times had imposed physical violence upon his wife prior to the summer of 1969.

In May of 1969, the Link family was in financial straits with approximately $3,000 of bills outstanding, most of which were for medical services to petitioner and for the boy, Andrew John Link. Petitioner desired to help in the financial difficulty and offered to obtain a job as a waitress or as a nurse's assistant, to both of which respondent objected. A neighbor of the parties was a go-go dance girl. After discussions with the neighbor, petitioner offered to get the same kind of a job, to which the respondent consented. Petitioner obtained such a job at a cafe, Charlie's Bar, in Trenton, N. J., for several nights a week. On occasion,

respondent visited the establishment where petitioner was employed, watched her perform and also observed that she spoke with individual patrons sitting at the bar. To this he objected in July of 1969, and asked petitioner to quit her job. This she refused to, saying that she wished to continue to work until September of 1969. While working at the establishment, petitioner met a Frank Wollman, who was first a patron and then became an employed bartender at the establishment. In the beginning, friendly relations existed between Mr. Wollman and Mr. Link and on two occasions Mr. Wollman was invited by Mr. and Mrs. Link to the Link home. Also, on one occasion, when Mr. Wollman was making a delivery for his employer in the neighborhood of the Link home, he stopped during the daytime to visit with Mrs. Link. Eventually, in July, Mr. Link became of the opinion that his wife and Mr. Wollman were becoming too friendly and he thereupon demanded that she quit her job, which she did. Mr. Wollman was a married man and had been separated from his wife. He and his daughter, a child about three years old, were residing with his parents in Trenton, N. J., at 1423 South Clinton Street.

About the first of August 1969, petitioner received a phone call from a female friend or acquaintance, Bernice, stating that she was at the New Jersey seashore with Frank Wollman and that he had suffered a severe neck injury and she asked petitioner to drive Mr. Wollman from the seashore to a hospital in Trenton, N. J. Without phoning to her husband, the respondent, at his place of work to get his permission to comply with the request or to inform him of what she intended to do, petitioner drove to the seashore and then drove Mr. Wollman therefrom to a hospital in Trenton, N. J. That same day, respondent was told by petitioner what she had done. He told her that it was

wrong for her to have done so and it was at this time that he asked her to quit her job as a go-go dance girl at Charlie's Bar, and she did, in fact, quit.

On August 4, 1969, the parties quarreled over what petitioner believed to be physical violence by respondent upon their son. Respondent has denied committing any violence upon the boy. During the course of the argument, respondent did use violence upon his wife. There is a difference in their respective versions as to what happened. We accept petitioner's version "He grabbed me around the neck and squeezed until I blacked out, then threw me to the floor, and I must have came to right away, and then he hit me on my back. I got up, and I staggered to the bedroom and called my doctor and I told him I was hurt badly." Respondent then drove petitioner to the family doctor, who confined her to bed for a period of four days until there was a hospital bed available, there being none available at the time of the occurrence. During the four-day interval, at times petitioner intentionally struck her head severely against the headboard of the bed. At the end of the four days, petitioner was admitted to the hospital and remained therein for three and a half weeks. She described her treatment as "I had brain scanning. I had spinal tap. I was in traction. I had intravenous fluid every day. I had needles, pills. I was tested by a neurologist." Petitioner attributes her hospitalization and treatment therein to the physical violence to which she was subjected by respondent on August 4, 1969. Respondent attributes the hospitalization to preexisting physical conditions from which petitioner suffered, and beating her head on the headboard. The evidence discloses that she had "internal troubles" and kidney trouble during the course of the marriage and was hospitalized therefor one or more times each year. Neither party called an attending

physician to testify. It appears to us that the hospitalization was due to respondent's violence upon petitioner, either as the prime cause or as aggravation of an existing condition.

During the time that petitioner was in the hospital, on two or three occasions she phoned to the hospital in which Frank Wollman was being treated, inquiring about his condition. On one occasion, she spoke briefly to him.

While petitioner was in the hospital, the hospital authorities barred respondent from the premises. The reason is not clear but we quote respondent's testimony: "A few days after she was admitted in there, we had been talking, and she had got violent, and she had I.V. going through her arm, and she ripped it out, and the doctors and nurses were running in, and I told them 'All right, I was going to leave.' "

On September 3, 1969, petitioner returned from the hospital to the family home. Respondent apologized for what he had done. Petitioner accepted the apology, stating that he had hurt her and it was hard for her to find forgiveness, but that she forgave him.

On September 9, 1969, petitioner, with the two children, left respondent, as hereinabove related, taking up residence with Mrs. Cremer at Groveville, N. J. Mrs. Cremer was separated from her husband at the time. She was also employed. During the time that petitioner lived with her, petitioner was also employed. Petitioner testified that Frank Wollman had been unemployed because he was still recuperating from the neck injury and that he had been baby sitting for the Cremer children while Mrs. Cremer was at work and when she, the petitioner, joined Mrs. Cremer at the Groveville apartment with her children, Mr. Wollman continued to baby sit for her children as well. She testified that Mr. Wollman was not living at that apartment during

the time that she resided there. She was corroborated in her testimony by Mr. Cremer, who had been a friend for a number of years of Frank Wollman. Mr. Cremer had been visiting his children with regularity at the Groveville apartment. He testified that Mr. Wollman did not live there and that he was baby sitting at the request of Mrs. Cremer.

After Mr. Link had taken the children back to his home, petitioner contacted him and he said that he would return the children to her, but he did not do so, thereafter saying that he would only return them to her if she would return to him. She continued to visit with her children at least once a week at respondent's home in Levittown. Respondent frequently requested her to return to him and she refused, stating that she was afraid of further physical violence.

In October of 1969, petitioner consulted with the Legal Aid Society attorneys in Trenton, N. J., with a view to regaining custody of her children.

In November of 1969, petitioner was hospitalized for a period of three weeks until December 3, 1969, because of bleeding kidneys. She testified that one kidney had dropped approximately two and a quarter inches and the other one was not in very good condition, but that her doctor has given her his approval of her ability to care for her children and lead a normal life and to return to work as long as she was not on her feet for more than a half hour or 45 minutes at a time.

Following her discharge from the hospital in December 1969, petitioner rented an apartment at 897 South Broad St., Trenton, N. J., consisting of two bedrooms, a living room, dining room, kitchen and bath. It is a second floor apartment above the Legal Aid offices in Trenton. A playground is available two blocks away for a recreation area for the children.

Mr. Wollman was called as a witness. He corrobor-

ated petitioner's testimony as to the circumstances under which they met at Charlie's Bar while she was go-go dancing, his eventual employment at the bar as a bartender, the circumstances under which Mrs. Link drove him from the shore to the hospital in Trenton, his baby sitting for the Cremer children and the Link children. In this respect, he testified that his daughter and the Cremer children had always played together and that while he was unable to work because of his neck injury, he took his daughter with him to Mrs. Cremer's apartment while he was baby sitting there. He denied that any improprieties had ever existed between himself and Mrs. Link and stated that their relationship was only one of friendship.

About a month prior to the first hearing herein, respondent gave to petitioner a six-page written list of "demands" which is of more than passing interest. They were demands imposing conditions upon which he would consent to petitioner having custody of the children. Among them were requirements that petitioner never leave the children alone or with friends or neighbors for any reason; that she break her ties with existing friends or mothers of friends; that she allow no one other than respondent in her apartment; that she not enter anyone's residence or place of work alone or with the children; that she not work and leave the children in another's care; that she not take them out without respondent's knowledge; that she obtain an unlisted phone number, giving it only to respondent and her doctor; that she not enter another's car herself or with her children; that she accept no gifts, offerings, etc., from friends for herself or the children, and "16. That you quit hating me for the past. I know what I did and so do you and everyone's brother. Find forgiveness."

In Commonwealth ex rel. Schmidt v. Schmidt, 8

Bucks Co. L. Rep. 180, at page 181 (1958), this court, speaking through President Judge Biester, said:

"We understand that a habeas corpus is not a divorce case and that custody is not to be fixed by placing the responsibility of separation on one of the parties and then placing the child with the other. Commonwealth ex rel. Gates v. Gates, 161 (Pa. Superior Ct. 423. Nevertheless, we believe that in the instant case, as in many others of like nature, the fitness of the parent may in some degree be measured by his or her maturity and personality balance as disclosed by an examination of the events leading up to the separation. Then, too, where a wife leaves her husband for reasons which appear to be arbitrary and capricious and thus deprives the child of the security of a home with both parents and remains adamant to any suggestion of reconciliation by the husband, we may well consider whether such an attitude does not display a limited interest in the best welfare of the child. . ."

It is for the above reason that we have dwelt in such detail on the conduct of the parties in relation to each other and with the circumstances leading up to their final separation. At the conclusion of the first hearing, we were, and still are, satisfied that on a number of occasions during the course of the marriage and prior to the occasion of August 8, 1969, respondent had inflicted physical violence upon petitioner. She testified that there were at least five or six occasions. He testified: "I can remember one other occasion. She was frightened of me, and she was shaking, and she had backed off into a corner, and she was so shaken up that I just . . . I slapped her across the face, and she started crying right away, and I held her to me, and that was it." We are satisfied that petitioner did have a fear of physical violence from respondent prior to the incident of August 4, 1969, and that it was because of that

violence and fear of a repetition thereof that she eventually left respondent and refused to return to him. His conduct at the hospital, which upset petitioner to the extent that respondent was denied visiting privileges, his ridiculous demands above referred to, would seem to do little to allay the fears which petitioner nourished, and we are further satisfied that it was not because of an affair which petitioner was having with Frank Wollman or love or infatuation for him that brought about her departure with her children from the family home and respondent.

We are also satisfied that the evidence at the first hearing falls far short of justifying even an inference of immorality on the part of petitioner in her relations with Frank Wollman.

With respect to a finding of emotional instability or immorality on the part of petitioner by reason of her separation and divorce from her first husband and her children born during that marriage, we do not think that the evidence justifies such inferences.

Mrs. Link testified that her first marriage, when she was age 15, was one of frequent arguments between herself and her first husband and they separated, that her first husband went overseas and she started going out with Mr. Link and they fell in love with each other. She went to Reno to get a divorce, but before the proceedings were completed, her first husband returned and threatened her through the children if she did not return; she did return to him for a short while and then contacted Mr. Link to get her at San Diego where she was living with her first husband; that Mr. Link did so; that on advice of her first husband's attorney she left her children in the custody of their grandparents with the understanding that she could return for them after she was married to Mr. Link. It was, therefore, apparent that respondent

herein was a participant in petitioner's final separation from her first husband. With respect to the charge that she deserted her said children, she testified: "When I first married Ronnie, he said he would take me back to get them, and after we were married he said it was no good to start out a marriage with somebody else's kids and he asked me not to see them. I asked him on several occasions. He said, 'All right, when we get the money.' But every year went by and he said, "No, No.' and he wouldn't let me."

Respondent herein has not denied his participation in the final break of petitioner with her first husband. He did, however, deny that he had refused to cooperate with her in getting the children of the first marriage. He testified that on several times he had offered to borrow money for that purpose but that petitioner was not interested. On the credibility issue, we have accepted petitioner's testimony.

In Commonwealth ex rel. Hickey v. Hickey, 213 Pa. Superior Ct. 349, at pages 351-52 (1968) the Superior Court stated:

"The lower court recognizes that the paramount consideration in any custody case is the welfare of the children. The ability to discuss and determine their best interest, however, is very trying. Accordingly, the courts of this Commonwealth have established various principles and presumptions to provide guidelines in making this difficult decision. Perhaps the most weighty of these is the recognition that 'Unless compelling reasons appear to the contrary, a child of tender years should be committed to the care and custody of its mother, by whom the needs of the child are ordinarily best served.' Commonwealth ex rel. Horton v. Burke, 190 Pa. Superior Ct. 392, 154 A.2d 255 (1959). See Commonwealth ex rel. Thomas v. Gillard, 203 Pa. Superior Ct. 95, 198 A.2d 377 (1964).

"Even more emphatically, as Judge Montgomery stated in Commonwealth ex rel. Logue v. Logue, 194 Pa. Superior Ct. 210, 166 A.2d 60 (1960), 'One of the strongest presumptions in our law is that a mother has a prima facie right to her children over any other person.' (p. 215)

"The strength of the presumption has been demonstrated, for example, even in those cases where there has been a moral lapse which does not directly involve the care and treatment of the children. Commonwealth ex rel. Thomas v. Gillard, supra; Commonwealth ex rel. Logue v. Logue, supra."

At the first hearing herein, respondent did not present evidence sufficient to establish any compelling reason for denying custody of the children to the mother in this case. We are fully satisfied that she deeply loves her children and is sincerely interested in their welfare; that she was physically and emotionally and morally capable of caring for them, in a manner conducive to their welfare. Respondent's evidence was insufficient to establish emotional instability or immoral conduct which would adversely affect the welfare of the children.

The former home of Mr. and Mrs. Link, where Mr. Link now resides, provides better physical and recreational aspects for the children than the apartment in which petitioner resided at the time of the first hearing. Had we awarded custody of the children to the father, his parents would have cared for the children during Mr. Link's absences at work, at Mr. Link's home in Levittown, as they had during the period between September of 1969 and the date of the first hearing, and it is conceded by petitioner that Mr. Link's parents had well cared for the children during that interval. However, we are of the opinion that this should not be a controlling factor in determining which parent should

have custody. See Commonwealth ex rel. George v. George, 167 Pa. Superior Ct. 563 (1950); Commonwealth ex rel. Logue v. Logue, 194 Pa. Superior Ct. 210 (1960).

For all of the foregoing reasons at the conclusion of the hearing on March 23, 1970, the custody of the children was awarded to petitioner, Mrs. Link.

On April 17, 1970, respondent presented his petition for a rehearing and reconsideration of our previous order, alleging the unfitness of the mother, Kevin Link, to have custody of her children by reasons of having perjured herself at the first hearing and also because of adulterous relations with Frank Wollman on April 7 and April 14, 1970. A hearing thereon was held on May 4, 1970. Two private detectives testified on behalf of respondent herein, Mr. Link. They testified that on the evening of April 7, 1970, they observed Frank Wollman enter the apartment of Mrs. Link, that by 9:30 p.m. the apartment was in complete darkness and it remained in complete darkness until 4 a.m. at which time their surveillance stopped and up to that time Mr. Wollman had not left the apartment. The same thing occurred on the night of April 14, 1970, except that the apartment went into darkness at 10 p.m. and the detective ceased his surveillance at midnight. On both occasions, the children were not at the apartment. They were with Mr. Link. Both Mrs. Link and Mr. Wollman admitted that he had been at the apartment on the dates mentioned and to the times mentioned by the detectives, but denied that the apartment was ever in total darkness and stated that Wollman was there for the purpose of doing repair work to the apartment and that he did such work, as well as joining Mrs. Link in having something to eat and watching the television and playing cards. They both testified that after she had first obtained her apartment in December of 1969,

it was badly in need of repairs and the landlord had agreed to rent it to her only if she could find someone to do the repair work while she was living there; that she referred Mr. Wollman to the landlord who then engaged Mr. Wollman and thereafter Wollman did the work on evenings and on weekends, when the Link children were not at the apartment, starting in December of 1969. The repair work consisted of some carpentry work, painting, plastering, repairing walls and removing wallpaper, varnishing floors. They both denied that Mr. Wollman had been in the apartment at any time when the Link children were there and they both denied having, on the evenings in question, or at any time, sexual relations with each other or even kissing or petting.

Mr. Link had done some detective work of his own when he was at the apartment of his wife for the purpose of picking up his children for visitation with him. On two occasions, Mrs. Link stepped out of the apartment for various reasons and during her absence Mr. Link found a valentine card, two TV rental receipts, a vial with Mr. Wollman's name on it, and a Federal Credit Union statement in the name of Mr. Wollman. The valentine card was addressed to "Sweetheart" and in addition to the printed matter thereon the following appeared in longhand: "To the Most Wonderful Man in the World, Loving you forever, Kevin." Mrs. Link testified that she had bought this for her husband but found that she could not give it to him; that she had told her husband this and also told him that she was going to give it to Frank Wollman, but she testified she did not give it to Wollman. Both of the television rental receipts were in the name of Mrs. Link, one of them dated November 15, 1969, had her address at Groveville upon it, the other dated November 23, 1969, had her name upon it and the address 1423 South Clinton

Avenue, Trenton, which was the address of Mr. Wollman's parents with whom he and his daughter lived. Mrs. Link explained this by stating that when she was committed to the hospital for her kidney trouble, she rented the television and she gave up the apartment in Groveville, N. J.; at the time of the rental of the television, mentioned in the second receipt, she had no address but it had been suggested to her that she live at the Wollman home and, therefore, she gave that address for the receipt purposes but that she never moved into the Wollman home. The presence of Mr. Wollman's Federal Credit Union statement and the vial with his name upon it were explained by Mrs. Link and Wollman as items probably left at the apartment by Wollman on the occasions on which he was working there. It is interesting to note that the last item on the credit union statement bears the date December 15, 1969.

The foregoing evidence was sufficient to establish an inference of adultery by Mrs. Link. Having established that, respondent Mr. Link has requested us to draw the further inference that such conduct took place on other occasions when the children were at the apartment. We have not drawn that conclusion.

A lapse from moral standards is not a controlling factor where the parent is not otherwise at fault and where the lapse does not involve the treatment and care of the children: Commonwealth ex rel. Logue v. Logue, 194 Pa. Superior Ct. 210 (1960).

We cannot draw the conclusion that Mrs. Link had perjured herself at the first hearing. At that hearing she denied that she had ever committed adultery with Mr. Wollman. On the basis of the evidence produced at the second hearing, as well as that at the first hearing, we have not concluded that an adulterous

relationship existed between Mrs. Link and Mr. Wollman prior to April 7, 1970.

At the first hearing, she testified that her relationship with Mr. Wollman was "merely friends." At the second hearing, both she and Mr. Wollman admitted that they had been "dating" since the first hearing. Our inclination was to draw the conclusion that Mrs. Link had lacked candor in her testimony at the first hearing in that she had not mentioned that she had obtained employment for Mr. Wollman by her landlord for the repairs on the apartment and that Mr. Wollman had been coming to the apartment, since December of 1969, ostensibly for that purpose. However, our examination of the transcript of her testimony at the first hearing does not disclose any question put to her which would elicit such information from her. In any event, she did not volunteer it.

It was our conclusion that respondent had not established compelling reasons at the second hearing to justify us in depriving the mother of custody of her children and awarding the custody to him. This conclusion was not easily arrived at. Following the hearing, we wished to study the briefs filed with us, do independent research on our own and ponder the evidence submitted. The ultimate conclusion, which was reflected in our order of June 22, 1971, was reached long before that date, but the order was delayed on the hope that the parents would reconcile and resume a family relationship with their children, which, in our opinion, would have been for the best welfare of the children. We felt an order, whichever way it went, would be a further obstacle in the way of reconciliation.